

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR-74,973-01

### EX PARTE BILLY RAY BRYANT, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### IN CAUSE NO. CR01125 IN THE 102ND DISTRICT COURT
### FROM RED RIVER COUNTY

**HERVEY, J., delivered the opinion of the Court in which MEYERS, PRICE, JOHNSON, KEASLER, COCHRAN, and ALCALA, JJ., joined. KELLER, P.J., filed a dissenting opinion. WOMACK, J., concurred in the result.**

## O P I N I O N

Applicant, Billy Ray Bryant, was convicted of capital murder and sentenced to confinement for life without the possibility of parole. Applicant argues that he received ineffective assistance of counsel at his trial. We will grant relief.

### BACKGROUND

The facts of this case primarily involve two families and their acquaintances living near the Texas–Oklahoma border in Red River County. Johnny Victory (Johnny) was married to Stella Walls Victory (Stella), and Kenneth Raulston (Kenneth) was married to

Sarah Raulston (Sarah). The Victorys had three children who were involved in this case: Jonathan, Aaron, and Dalinda. At the time of the incident, Jonathan, ten, was the oldest, Dalinda was nine, and Aaron was eight.

In 1987, both couples separated. Johnny began living with Sarah, and later, Kenneth began living with Stella. Sarah subsequently retained an attorney to initiate divorce proceedings and obtained a temporary restraining order against her husband Kenneth. The evening of February 10, 1987, the three Victory children, Johnny, and Sarah, ran some errands and went to eat at a nearby Pizza Hut. After eating, Johnny, Sarah, and the Victory children returned to Sarah's home in Red River County. It was about 9:00 p.m. Aaron rode with Johnny in his car and Jonathan and Dalinda rode with Sarah in her car. Shortly after Johnny and Sarah exited their vehicles, they were shot and killed. Johnny was shot in the head twice, and Sarah was shot in one arm and her head.

The lead investigator, Texas Ranger Almond, took approximately 70 photographs of the scene, collected 34 physical exhibits, and submitted a final report 60 or 70 pages in length. About 35 to 40 people were interviewed during the investigation, including the Victory children, who were interviewed multiple times. Throughout the interviews, the children told police that on the night of the murders they saw Kenneth, a man named Mitchell Dickey (Mitchell), and one other individual named Tom. And although Ranger Almond testified at first that none of the children could identify "Tom," he later changed his testimony and stated that Jonathan identified a man in a lineup named Jim Ed

Monkhouse as the Tom the children saw that night. Despite that identification, the ranger

testified that Monkhouse was excluded as a suspect. Ranger Almond did believe,

however, that a third shooter was involved, but he did not believe that the third shooter

was a person named Tom as the kids had stated in 1987.[1] After completing his

investigation of the murders, Ranger Almond testified that there was no evidence

implicating Applicant or anyone else in the crime.

Nonetheless, within a year a grand jury indicted Kenneth and Mitchell for capital

murder.[2] After the indictments were returned, Kenneth died in an automobile accident

while allegedly attempting to force Stella off of a road after the two had an argument. He

collided head-on with another car, killing the occupants, a young boy and his father. The

State eventually dismissed the capital-murder indictment against Mitchell.[3]

---

[1]It appears from the record that Ranger Almond thought that the children were not telling the truth in 1987 that a third person named Tom was involved in the murders because the children were scared. However, we note that the children identified both Kenneth and Mitchell as being involved in the murders despite any fear the children may have felt. Moreover, in 1987, Jonathan also successfully identified the Tom the children spoke of as Jim Ed Monkhouse, which seems to contradict Ranger Almond's conclusion.

[2]Although Kenneth and Mitchell were indicted for capital murder, Sheriff Reed stated that he did not believe the case "could make it" when it was indicted.

[3]The capital-murder indictment against Mitchell was dismissed for lack of evidence after the case had been reopened and Mitchell accepted the State's plea-bargain offer. The State promised Mitchell a sentence within the range of 5-10 years in exchange for pleading guilty to murder and testifying against Applicant. Mitchell was sentenced to 5 years' confinement to run concurrently with his other state sentences. At trial, the defense suggested that Mitchell agreed to cooperate against Applicant to reduce the charge against him from capital murder—from which he could never be paroled—to murder, from which he could be paroled as soon as three years after conviction. And in closing arguments, the defense stated:

The case was cold until a new sheriff, Terry Reed, was elected. He reopened the investigation into the double homicide about 19 years after the State elected not to pursue the indictment against Mitchell, and Kenneth had died in the automobile accident. The new investigation uncovered several things. First, DNA testing was performed on a beer can found at the scene in 1987, which had only Kenneth's fingerprint on it. Second, information had come to light from a person incarcerated with Mitchell—Donnie Miller—who told investigators that Mitchell had told him that he personally used a shotgun to murder Johnny and Sarah.[4] Investigators interviewed Mitchell after receiving

---

> I would suggest to you what happened to [Mitchell] is he shows up down here, going to turn himself in on this blue warrant [for violating his parole], [and] hope he doesn't catch a lot of time. They start asking him about this [capital] murder again, and he says well, gee, I have already passed two polygraphs. I can do that again. Whoops! Turns out maybe he can't do that again, so now what is the boy to do?

> Better cut my losses as best I can. I'll blame it on [Applicant], and that's exactly what he did. So he can get a deal for five years in prison, running concurrent with what he has got now. He told you, yeah, I could get parole in a couple of years. You think he has got a motive? You think he's got an interest in this thing? That's his interest. His interest is not in anything to do with Victory's children, closure for them and closure for him. What he's interested in is how fast can I get out of the penitentiary.

[4]Mitchell confessed to Donnie when they were both confined at the Red River County jail "right after the murders." In a written statement given to investigators, Donnie stated that Mitchell told him that:

> [H]e had been paid to kill a man that was a boyfriend and lover of Sara Raulston. Mitchell told me that he went to Sara Raulston's house to kill the man and when he got there he shot and killed the man by the doorway. Mitchell said that Sara also arrived at the house and he also killed her. Mitchell told me that he heard some kids in the house and so he fled the scene. He said that the kids were Sara's kids and that the kids would know him. . . . Mitchell also told me that Kenneth Raulston, Sara Raulston's husband had hired him to kill the man. . . . Mitchell

the information from Donnie Miller. When Mitchell spoke with investigators, he initially maintained that he knew nothing about the murders. Later, however, after being told that he failed a polygraph test, he admitted that he was involved, but he implicated Applicant and stated that he acted only as the get-away driver. Aaron gave a new statement that "mainly focused in on Mitchell . . . " but also indicated that other people were present the night of the murders, including Applicant. Finally, Janie Mussett (Janie), Applicant's live-in girlfriend at the time of the murders, was interviewed by police once the case was reopened, and after being told that she also failed a polygraph test, she signed a written statement implicating Applicant.

Applicant was indicted by a Red River County grand jury for capital murder. After a two-day trial in January 2008, Applicant was convicted and sentenced to confinement for life without the possibility of parole. He appealed to the Texarkana Court of Appeals, which affirmed his conviction. *See Bryant v. State*, 282 S.W.3d 156, 176 (Tex. App.—Texarkana 2009, pet. ref'd). We refused his petition for discretionary review.[5]

Applicant then filed an application for a writ of habeas corpus. On January 12, 2011, we held his application in abeyance and ordered the convicting court to make

---

said that Kenneth Raulston wanted the man killed because Kenneth believed that Sara was going to divorce him and he would loose (sic) his property and kids.

[5]Applicant's petition for discretionary review was originally dismissed on August 19, 2009, but, on rehearing, this Court reinstated his petition on October 7, 2009. *See Bryant v. State*, No. PD-0594-09, 2009 WL 3215669 (Tex. Crim. App. Oct. 7, 2009) (per curiam) (op. on reh'g) (not designated for publication). Nonetheless, Applicant's petition for discretionary review was later refused on November 4, 2009.

findings of fact and conclusions of law as to whether Dalinda, Johnny's daughter, committed perjury when she changed her testimony as a rebuttal witness and implicated Applicant after testifying favorably for Applicant. *See Ex parte Bryant*, No. WR-74,973-01, 2011 WL 199058 (Tex. Crim. App. Jan. 12, 2011) (per curiam) (not designated for publication). On September 12, 2012, after receiving the supplemental record from the convicting court, we determined that Applicant's perjury claim was without merit. *See Ex parte Bryant*, No. WR-74,973-01, 2012 WL 4048839 (Tex. Crim. App. Sept. 12, 2012) (per curiam) (not designated for publication). However, instead of denying the application, this Court held the application in abeyance again and ordered the trial court to make additional findings of fact and conclusions of law as to whether Applicant's trial counsel was deficient and, if so, whether counsel's deficient performance prejudiced Applicant. *Id.* The convicting court, after making additional findings, recommended that we deny relief. We subsequently filed and set Applicant's case for submission. *See Ex parte Bryant*, No. WR-74,973-01, 2014 WL 467830 (Tex. Crim. App. Feb. 5, 2014) (per curiam) (not designated for publication).

### APPLICANT CAN RAISE HIS POSTCONVICTION-POLYGRAPH CLAIM

In this Court, Applicant has briefed one ineffective-assistance-of-counsel claim:[6] whether Applicant's trial counsel was ineffective because of his repeated failures to object to polygraph evidence about Janie. However, before we address the merits of

---

[6]Applicant raised eight grounds in his memorandum attached to his application for a writ of habeas corpus, but he briefed only one of those issues to this Court.

Applicant's claim, we must address a threshold issue raised by the convicting court in its findings of fact and conclusions of law: Whether the court of appeals already ruled on the merits of the polygraph claim, thereby precluding our review under *Ex parte Acosta*, 672 S.W.2d 470, 472 (Tex. Crim. App. 1984).

Applicant argues that the court of appeals did not address the merits of his claim on appeal because it held that the record was "silent" as to the issue. *See Bryant*, 282 S.W.3d at 172. He also asserts that, assuming the court of appeals did rule on the merits of his claim, he has brought forth new evidence, namely the affidavit response from trial counsel and a voicemail from trial counsel to Applicant's current counsel, that allows him to reurge his claim. *Ex parte Nailor*, 149 S.W.3d 125, 131 (Tex. Crim. App. 2004) (holding that although an appellant raised an ineffective-assistance-of-counsel claim on direct appeal and a court of appeals ruled on the merits of the claim, that appellant's claim could be properly raised again in a postconviction proceeding if he provides additional evidence to prove his claim). The State does not appear to resist Applicant's reurging of his claim.[7]

---

[7]In the first footnote of the State's brief, and in reference to the repeated citation by the convicting court of our decision in *Acosta*, the State conceded:

> The State will acknowledge, however, that "[c]laims of ineffective assistance of counsel are frequently raised on direct appeal without the benefit of an adequate record and then re-urged on a writ of habeas corpus after they have been adequately developed in a post-conviction evidentiary hearing." *See Ex parte Nailor*, 149 S.W.3d 125, 130 (Tex. Crim. App. 2004). In *Ex parte Torres*, 943 S.W.2d 469 (Tex. Crim. App. 1997), this Court held that "because the direct appeal record contained insufficient evidence to evaluate the ineffectiveness

We need not decide whether the court of appeals rejected Applicant's claim on the merits because we hold that his claim falls within the ambit of the *Nailor* exception in light of the new evidence presented. Therefore, Applicant's claim is not barred, and he may reurge it now. We now turn to Applicant's claim.

### APPLICANT'S CLAIM

Applicant argues to this Court that his trial counsel was ineffective. Specifically, Applicant alleges that his counsel was deficient for repeatedly failing to object to references to Janie's polygraph test and the results of that test, and Applicant was prejudiced by trial counsel's deficiency.

First, Applicant asserts that trial counsel's failure to object to the repeated mentioning of Janie's polygraph test was objectively unreasonable because of this Court's past decisions and decisions of other Texas courts across the State. He cites a litany of decisions stating that the fact that a person took a polygraph test and the results of such a test are never admissible.[8] Thus, Applicant concludes, trial counsel's error was deficient

---

issue, . . . The rejection of [applicant's] claim on direct appeal does not bar relitigation of his claim on habeas corpus to the extent that applicant seeks to gather and introduce additional evidence not contained in the direct appeal record." *See id.* at 475.

State's Brief, No. WR-74,973-01, at 17–18 n.1.

[8]*See Tennard v. State*, 802 S.W.2d 678, 683–84 (Tex. Crim. App. 1990); *Nethery v. State*, 692 S.W.2d 686, 700 (Tex. Crim. App. 1985); *Crawford v. State*, 617 S.W.2d 925, 930–31 (Tex. Crim. App. 1980) (op. on orig. submission); *Fernandez v. State*, 564 S.W.2d 771, 773 (Tex. Crim. App. [Panel Op.] 1978); *Cardenas v. State*, 960 S.W.2d 941, 947–48 (Tex. App.—Texarkana 1998, pet. ref'd); *Jones v. State*, 680 S.W.2d 499, 502 (Tex. App.—Austin 1983, no pet.).

as a matter of law because the evidence was not admissible even by stipulation of the parties. He also argues that trial counsel's failure to object was not a strategic decision supported by the record or prevailing professional norms. As to professional norms, Applicant asserts that this Court, and other appellate courts in Texas, have held defense counsel deficient who allowed "unfettered bolstering" of witnesses and patently objectionable testimony to be elicited in front of a jury.[9] As to Applicant's assertion that trial counsel had no reasonable trial strategy, Applicant cites two pieces of evidence. First, he directs us to his trial counsel's affidavit in which he stated that he should have objected to the polygraph evidence. Second, Applicant cites a voicemail from trial counsel to Applicant's current counsel, allegedly discussing the admission of the polygraph evidence and stating,

> Jason, Dan Meehan on, uh, Billy Bryant, uh, the judge was here when I talked to you yesterday so I talked with him. I think probably, uh, he wasn't going to do anything for Billy if I said I was high on cocaine during the trial. But, uh, anyway, I talked to him and told him I didn't have any idea what happened or that there was anything tactical to it, but I don't -- like I said, my impression was he wasn't going to do anything to help. But if you need to talk about or want to talk about it gimme a call . . . talk to you later.

This lends credence to Applicant's contention that his trial counsel had no reasonable

---

[9]*See Robertson v. State*, 187 S.W.3d 475, 484–85 (Tex. Crim. App. 2006) (the appellant's trial lawyer was deficient when he allowed the jury to hear prejudicial and clearly inadmissible evidence of prior convictions); *Sessums v. State*, 129 S.W.3d 242, 248 (Tex. App.—Texarkana 2004, pet. ref'd) (finding "no conceivable strategy or tactic that would justify" allowing "clearly and unquestionably objectionable testimony of the most outrageous and destructive type" regarding inadmissible evidence that a child witness was being untruthful when he made allegations of sexual molestation ).

strategy when he allowed the polygraph evidence to be elicited. In addition, the allegation that trial counsel, a witness in these postconviction proceedings, engaged in ex parte communication with the judge is troubling. Applicant's habeas counsel was sufficiently concerned about the communication that, once he was made aware of it, he filed a motion to recuse the judge, but the motion was denied.

Finally, Applicant argues that he was prejudiced by his trial counsel's deficient conduct because, if trial counsel had objected and requested a mistrial, it should have been granted. *See Long v. State*, 10 S.W.3d 389, 398–99 (Tex. App.—Texarkana 2000, pet. ref'd) (citing *Nichols v. State*, 378 S.W.2d 335, 337–38 (Tex. Crim. App. 1964) (stating that it is "highly prejudicial" to introduce into evidence that someone took a polygraph test, that "no instruction from the court [can] remove" that prejudice, and that the judge erred by not granting appellant's motion for new trial); *Banda v. State*, 727 S.W.2d 679, 682–83 (Tex. App.—Austin 1987, no pet.)).

The State responds that "[t]he history of this Court's dealings with polygraph evidence is long but not very complicated. For more than sixty years, this Court has not once wavered from the proposition that 'the results of polygraph examinations are inadmissible over proper objection because the tests are unreliable.'" State's Brief, No. WR-74,973-01, at 20–21 (quoting *Leonard v. State*, 385 S.W.3d 570, 577 (Tex. Crim. App. 2012) (op. on reh'g)). However, the State argues that for this Court to hold that defense counsel's representation amounted to deficient conduct, this Court "must

necessarily hold that, under all circumstances, the failure to object to polygraph examinations [falls] below an objective standard of reasonableness, and comprised *per se* ineffective assistance [of counsel]." Further, the State asserts that there was a strategic reason for not objecting to the polygraph evidence, and it relies on the findings of fact from the convicting court to support its assertion.

Alternatively, the State asserts that Applicant cannot meet the prejudice prong of the *Strickland* test because this Court has held that a defendant is prejudiced only when the fact that a defendant or a crucial witness took a polygraph test and the results of that test came to light at trial. *Compare Tennard*, 802 S.W.2d at 683–84, *with Robinson v. State*, 550 S.W.2d 54, 59–60 (Tex. Crim. App. 1977) and *Nichols*, 378 S.W.2d at 336–37.[10] Furthermore, the State argues that Applicant "did not, and could not, establish that the result would have been different in the present case because other individuals" saw Applicant, Aaron identified Applicant as the man who murdered his father, and Janie and Mitchell were not the sole witnesses at trial to prove Applicant's guilt nor were they crucial witnesses.

### THE POLYGRAPH EVIDENCE

Janie was called by the State during its case-in-chief as its sixth witness. The State began by asking her a few preliminary questions, including whether she remembered

---

[10]The State appears to agree with Applicant that the polygraph evidence at issue was not admissible. Instead, the State asserts that "neither Janie Mussett nor Mitchell Dickey were the sole witness or even a crucial witness to the murder underlying [Applicant]'s conviction." State's Brief, WR-74,973-01, at 23.

giving a statement on May 1, 2007. She answered that she did remember giving such a statement, but she also stated that "a lot of things I said in that statement is (sic) not true, because I was scared." The State then went through Janie's statement asking her if she had made each allegation contained in the statement.[11] She denied making many of the

---

[11]After omitting personal identifying information, Janie's entire written statement reads as follows:

> Before me the undersigned authority in and for said County and State, on this day, Tuesday, May 01, 2007, personally appeared, Janie Mussett, . . . who, after being by me duly sworn, deposes and says:

> I lived with Bill Bryant for approximately two years beginning around October of 1985. Bill was good friends with Kenneth Raulston. Kenneth's wife was Sarah.

> My sister Stella was married to Johnny Victory. After Bill and I had lived together for about a year, Johnny and Stella separated and Kenneth and Sarah separated. Johnny started living with Sarah Raulston and Kenneth started living with Stella. Kenneth became very jealous because Johnny was . . . living with Sarah. I once heard Kenneth say that he did not like it because Johnny was living with Sarah in his, Kenneth's house and spending his, Kenneth's money. Stella once told me that Johnny kidnapped Kenneth, hit Kenneth in the head with a gun several different times and sexually assaulted Kenneth in the anus.

> On New Years Eve, 1986 I witnessed Johnny beat Stella up at Marie's Tavern in Valliant, Oklahoma. Johnny stuck his hand up in Stella's private parts when he assaulted her. Johnny also cut Stella's face with a knife. A couple of weeks later, Bill and I met Kenneth and Stella at a motel in DeQueen, Arkansas. We all stayed one night at the motel. While we were there, Kenneth and Bill left alone. After they returned to the motel, Bill told me that Kenneth wanted Bill to help Kenneth kill Johnny Victory. Bill was upset with Kenneth and Bill told me that Kenneth was crazy.

> Maybe three or four weeks later, I learned that Johnny Victory and Sarah Raulston had been killed. Stella and I were at Don Ed Payne's office in Hugo, Oklahoma and Don Ed told us that Johnny and Sarah had been killed the night before. Don Ed is an attorney. This really upset Stella.

> Maybe a month later, Bill and I were at Stella's house where we were staying

statements, including the ones inculpating Applicant. And when Janie also denied being threatened by Applicant, the State elicited further testimony from Janie that Sheriff Reed told her that it would be better if she proved her story by taking a lie-detector test. The State then asked Janie if she had proven her story by taking the polygraph test. Janie responded that "[t]hey didn't show [the results] to me." The only objection raised by the defense during Janie's testimony was to the admission of her written statement[12] and not the evidence that Janie took a polygraph test or the possible results of the test. Trial counsel also failed to ask for a limiting instruction for the written statement initialed by Janie. On cross-examination, Janie testified that, at the time of the murders, she was Applicant's girlfriend and that she lived with him and some other family members. She further testified that Applicant was at home the night of the murders. At the end of cross-

---

because our trailer house had burned. Stella was drinking and crying. Stella told me that Kenneth told her me (sic) that Thomas Stringer, Jim Ed Monkhouse, Lewis Perkins, Bill and Kenneth had killed Johnny and Sarah. About a week later, Bill and I were in our bedroom. Bill said, "Me and Kenneth went to Kenneth and Sarah's house and shot and killed Johnny and Sarah." Bill also told me that there was a third shooter there but he did not tell me who the third person was. After [B]ill told me this, Bill told me that if I ever told anyone that he and Kenneth killed Johnny and Sarah, he would hurt me. I understood this to mean that he would hurt me, my children and my family.

A short time later, Bill and I moved to Millerton, Oklahoma. I lived in Millerton about eight months after that and then moved into Stella's trailer house. Stella had moved out and was living with a guy named Steve. I never lived with or associated with Bill Bryant after that. (End of statement).

[12]The defense objected on the grounds that the statement was hearsay and not the best evidence. However, the trial court overruled both objections and, except for a redaction, admitted the exhibit for all purposes, including as evidence of Applicant's guilt and not just to impeach Janie's trial testimony.

examination, the defense asked Janie to "[t]ell the jury what the truth is." Janie reiterated that Applicant did not commit the crime, that he was at home the night of the murders, that she had no reason to lie, and that the officers "said I took the test and I flunked the test." The defense never objected to the State's introduction of evidence about Janie taking a polygraph test or the results of that test. Then, the defense directly questioned Janie about the polygraph test she took.

Next, the State called to the stand United States Secret Service Agent Mark VanderVlugt, who administered the polygraph test for Janie. During direct examination, Agent VanderVlugt never mentioned the polygraph test or its results directly. Rather, he testified that, initially, Janie did not want to tell the truth,[13] but that a couple of hours later she told investigators that Applicant had confessed to her after she became emotional. On cross-examination, the defense asked VanderVlugt how he knew "what the truth was," but the State objected because "[t]here's a federal law that prevents [VanderVlugt] from talking about what was performed on her at the time, *the polygraph test*." Thus, the State raised the issue of Janie taking a polygraph test again, this time in its objection that VanderVlugt could not specifically testify about the lie-detector test Janie took or the results of that test. However, once again the defense did not object, ask for an instruction to disregard, or a mistral.

Janie's polygraph test and the results of that test were brought up again by the

---

[13]The defense did not object to this comment.

State when Sheriff Reed was recalled to the stand. This time, however, Janie's polygraph test and its results were expressly discussed. The State asked Sheriff Reed whether investigators had a reason not to believe Janie's story, and he responded that, when "she took the polygraph test, it indicated deception." The Sheriff then explained why Agent VanderVlugt was involved in the investigation and how he could know whether Janie was telling the truth to investigators: Agent VanderVlugt "administered the polygraph test."

On redirect, the State again elicited testimony about Janie and the polygraph test she took:

> [STATE]: If it had turned out that she passed the lie detector test and [Applicant] was in fact home that night and she was telling the truth, that would have been the end of it. Right?
>
> [SHERIFF REED]: That would have been the end of it.
>
> [STATE]: And your attention would have turned in some other direction. Is that correct?
>
> [SHERIFF REED]: That's correct.

The defense did not object to any of the testimony regarding Janie taking a polygraph test or failing it, although Sheriff Reed definitively testified that the police would have stopped investigating Applicant if the polygraph results had not indicated that Janie lied about Applicant being home the night of the murders. Sheriff Reed's testimony that the police would have stopped investigating Applicant if Janie had not indicated deception seems to directly contradict the State's argument that Janie was not a crucial witness.

**HABEAS PROCEEDINGS**

Trial counsel submitted an affidavit answering each of Applicant's claims of ineffective assistance of counsel. In response to Applicant's polygraph claim, trial counsel stated:

> [Applicant] raises the issue of my failure to object to references to polygraph examinations in the trial. I should have objected to the testimony regarding polygraph exams taken by Janie Mussett and Mitchell Dickey, however, since the subject was broached by the State, I felt it would be in the minds of the jurors.
>
> Janie Mussett had assured me her testimony would be favorable to [Applicant] and it was.
>
> As to Mitchell Dickey, who had told so many variations on the killings and who was involved, I didn't feel his testimony was going to be credible under any circumstances.

In addressing Applicant's polygraph claim, it appears that the convicting court concluded that, despite counsel's statement that he should have objected, counsel had a trial strategy, which was to avoid drawing more attention to the evidence by not objecting when it was raised. Furthermore, the court concluded that not objecting fell within the wide range of reasonable assistance and should not be considered deficient.

**THE LAW**

The Sixth Amendment to the United States Constitution guarantees an accused the assistance of counsel to prepare a defense. *See* U.S. CONST. amend. VI. The Sixth Amendment right to counsel has been interpreted as "the right to the effective assistance of counsel." *Robinson v. State*, 16 S.W.3d 808, 812 (Tex. Crim. App. 2000) (citing

*McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). In *Strickland*, the United States Supreme Court explained that a claimant can prove that he received ineffective assistance of counsel by showing that his counsel's representation was deficient and that the deficient performance caused him prejudice. *Ex parte Cockrell*, 424 S.W.3d 543, 545 (Tex. Crim. App. 2014) (citing *Strickland*, 466 U.S. at 690–94); *see Hernandez v. State*, 726 S.W.2d 53, 56–57 (Tex. Crim. App. 1986).

A claimant can prove deficient performance by showing that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. An objective standard of reasonableness is defined by prevailing professional norms at the time of trial. *See id.* at 688. However, because of the difficulty of assessing attorney conduct in hindsight, and because one defensive theory for a crime may work with one attorney and jury but not another, there is a presumption that the trial attorney's performance conformed to prevailing professional norms at the time of trial—i.e., the challenged action "might be considered sound trial strategy." *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). In other words, depending on the circumstances and strategy employed, certain representation by counsel that may fall below an objective standard of reasonableness in one trial may not in another. *See Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005).

Furthermore, appellate scrutiny of the performance of counsel is highly deferential, and trial counsel's performance is assessed by the totality of the circumstances as they

existed at the time of trial, not with the benefit of hindsight or by relying on only isolated circumstances at trial. *See Ex parte Flores*, 387 S.W.3d 626, 633–34 (Tex. Crim. App. 2012). A claimant must generally prove deficiency using affirmative evidence in the trial record sufficient to overcome the presumption that the challenged action was sound trial strategy. *See Strickland*, 466 U.S. at 689; *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). However, "when no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflect[s] the trial counsel's subjective reasons for act[ing] as [he] did." *Andrews*, 159 S.W.3d at 102.

To prove prejudice, a claimant must establish a "reasonable probability" that the result of the proceeding would have been different if counsel had not been deficient.[14] *Strickland*, 466 U.S. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. *Id.* Whether there is a reasonable probability that confidence in the outcome of the trial is undermined can turn on evidence adduced at trial because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

## DISCUSSION

---

[14]The State's brief incorrectly states the applicable inquiry in a *Strickland* prejudice analysis as whether Applicant could establish "that the result would have been different in the present case . . . ." However, the proper inquiry is whether there is a *reasonable probability* that the outcome could have been different. *See Strickland*, 466 U.S. at 694.

***A. It is not deficient as a matter of law to allow the introduction of polygraph evidence.***

Polygraph evidence is generally excluded from courtrooms because the reliability of such tests remains unproven and jurors could attach undue credibility to a test that purports to sort truth from fiction, a role for which a factfinder is more properly suited. *See Leonard*, 385 S.W.3d at 577–81, 583 (chronicling the history of the use of polygraph tests in Texas and holding that polygraph evidence amounts to "scientifically unreliable facts or data"). However, we need not hold, as the State argues, that if Applicant's defense attorney's failures to object were deficient, the conduct of all similar attorneys failing to object would also fall below an objective standard of reasonableness. Instead, we hold that, although the introduction of polygraph evidence almost always falls below an objective standard of reasonableness because most attorneys will have no reasonable strategy in allowing the introduction of such evidence, we cannot categorically exclude the possibility that a trial attorney, under certain circumstances, could use the admission of polygraph evidence to his client's favor. We do find, however, for the reasons explained below, that Applicant's trial counsel was deficient in this case.

**B. Defense counsel was deficient.**

Defense counsel stated that he should have objected to the polygraph evidence. However, he went on to state that, "since the subject was broached by the State, I felt it would be in the minds of the jurors" and that Janie "had assured me her testimony would be favorable to [Applicant] and it was." The convicting court took a slightly different

view of trial counsel's representation and concluded that trial counsel did have a strategy in not objecting to the assortment of polygraph evidence: "[C]ounsel made the determination not to draw more attention to the evidence by lodging an objection."

We first note that any assurances that Janie may have given to trial counsel that her testimony would be favorable are irrelevant because trial counsel is not accused of having engaged in deficient conduct by calling Janie to the stand. And to the extent that trial counsel and the convicting court assessed Janie's testimony as favorable to Applicant, we address that question in the prejudice inquiry explained below.

The habeas judge found that trial counsel's trial strategy not to object was reasonable because he wanted to avoid drawing attention to the polygraph evidence. Such a strategy is commonly cited in ineffective-assistance-of-counsel cases and for good reason. That strategy may be particularly useful when, for example, only a passing, but possibly objectionable, reference is made and the defense attorney believes that the reference would largely go unnoticed. However, such a strategy loses its efficacy and becomes less reasonable when, as in this case, opposing counsel repeatedly draws the jury's attention to the objectionable evidence. In addition, it is difficult to conceive of how defense counsel was effectuating a reasonable strategy not to draw attention to the polygraph evidence when he also asked questions about Janie's polygraph test.

Based on our examination of the entire record, we hold that trial counsel's performance was deficient. We now turn to whether Applicant was prejudiced.

**B. Applicant was prejudiced in light of trial counsel's deficient performance.**

On these specific facts, the record supports the conclusion that Applicant has shown that he was prejudiced by his trial counsel's deficient conduct. This is especially true because the other evidence of guilt adduced at Applicant's trial was weak. *See Strickland*, 466 U.S. at 696. Consequently, trial counsel's failure to object to the admission of the existence and results of a polygraph test taken by Janie prejudiced Applicant because, without that testimony, there is a reasonable probability that the outcome of the trial would have been different. Moreover, if Applicant's trial counsel had asked for a mistrial based on the inadmissible polygraph evidence, the trial court should have granted it. *See Nichols*, 378 S.W.2d at 337–38 (stating that revealing the fact that a polygraph test was taken is "highly prejudicial" and "no instruction from the court [can] remove it" and that "the learned trial judge fell into error in not granting appellant's motion for a mistrial").

To prove its case, the State relied primarily on the testimony of witnesses changing stories from earlier statements, changes in testimony at trial, and the existence and results of polygraph tests.[15] With respect to polygraph evidence, the State heavily relied upon

---

[15]While no other direct or circumstantial evidence of Applicant's complicity in the murders existed, the State did call the co-defendant's mother to the stand to testify that she feared Applicant because, in 1989, he came to their home in New Mexico and threatened them with harm if Mitchell "opened his mouth." However, Denna Dickey also testified that she never called the police regarding the incident, she did not know who murdered the victims, and she denied concocting a story to get her son a "sweet deal."

We do note, however, that we are troubled by the State's apparent strategy to convict Applicant by trying Kenneth by proxy. For example, in opening arguments, and although it is not

copious amounts of testimony about the existence of polygraph tests and their results[16] to rebut the two defensive theories that Applicant had an alibi, and that this case was too old with too little evidence to convict him. The polygraph tests and results thereof of both witnesses—Mitchell and Janie—were discussed throughout both the State's case-in-chief and during its closing arguments. At trial, the prosecution noted that Mitchell, Applicant's codefendant, had indicated deception during a polygraph test when he stated that he knew nothing about the crime but, once confronted with his results, he "broke down" and "asked the police to pull up a chair" so that he could tell them the truth. Although the defense elicited testimony that Mitchell had passed two earlier polygraph tests in 1987 during which he denied knowing anything about the murders, the State sought to establish Mitchell's credibility by reconciling the different test results. The State proposed that,

---

evidence, the State offered the jury at least six motives for Kenneth to have murdered Johnny. In addition, the State called witnesses to testify whose only knowledge about the murders indirectly implicated Kenneth and not Applicant. For example, the State called Evelyn McColloch, who lived next to the Raulston house at the time of the murders, apparently to place Kenneth at the scene, because she testified only that the Raulston dogs were unruly and would bark incessantly unless Kenneth was there because he could control them. She never testified about Applicant. The State also called Jerry Conway, of the Texas Highway Patrol at the time of the murders, apparently solely to testify that Kenneth told him that if Johnny came "over the river," he would kill him. Conway testified that he had never met nor heard of Applicant. The State also elicited evidence that Johnny had kidnaped Kenneth, pistol-whipped him, sodomized him, stolen items from him (both legal property and contraband), and, according to the State, embarrassed him by making him "get out of a vehicle and play with his penis in front of some folks." Tactics such as these unnecessarily confuse the issues that the jury must resolve.

[16]The court of appeals addressed the pervasiveness of the polygraph evidence in this trial in a footnote: "[T]rial prosecutors—especially elected district attorneys—should always consider that their statutory mandate is 'to see that justice is done.' We question whether repeatedly referencing the forbidden subject of polygraphs and lie-detector examinations (as well as the results of such testing) advances that noble obligation." *Bryant*, 282 S.W.3d at 172 n.11.

despite three tests, two of which were administered in connection with the original investigation and resulted in evidence favorable to Applicant and one of which was administered only after the investigation was reopened and resulted in favorable evidence to the State, the machines operated correctly. The State argued that Mitchell failed the third polygraph over the same subject matter because he had grown a "conscience," and his subsequent confession implicating Applicant must have been true because of his new "conscience."[17] The prosecution also tried to minimize the fact that, in exchange for testifying against Applicant in 2008, Mitchell would plead guilty to murder (instead of capital murder), be sentenced to five years of confinement to run concurrently with other state sentences he was already serving (instead of a sentence of life confinement), and be parole eligible potentially much sooner than if he were convicted of capital murder.

With respect to Janie and polygraph evidence, to combat what was expected to be favorable testimony for Applicant and to corroborate the testimony of the codefendant Mitchell, the prosecution elicited testimony that Janie had taken a polygraph test, which indicated deception when she denied knowing anything about the murders. For example, at trial the State asked Sheriff Reed, "If it ha[d] turned out that [Janie] passed the lie

---

[17]Specifically, the prosecution stated in closing arguments,

[Y]ou know, you wonder why [Mitchell] passed the--or failed the lie detector test this time? Maybe it's because he has a conscience now, and that's what those things work off of? If you have a conscience and you lie, you start sweating and your heart rate goes up and you flunk. And now he has a conscience and back then he didn't, and that's the reason he failed it this time when he has a conscience; and now he's here trying to let you know, hey, this is what happened.

detector test and [Applicant] was in fact home and she was telling the truth, that would have been the end of it. Right?" The sheriff responded, "That's correct." In other words, if the police believed Janie, and not the results of the polygraph test she took, the police would have eliminated Applicant as a suspect. And the State urged the jury to believe what the police believed—that lie-detector tests are reliable for identifying truth and discarding fiction. The State also relied heavily on polygraph evidence with respect to Janie and the inference that the statement initialed by Janie after she was told she failed the polygraph test was the "real truth."[18] This emphasis continued during closing arguments, as it did with respect to Mitchell's polygraph tests.

This case was well known in the area because of the gruesome nature of the murders, the fact that the murders took place in a small town and involved two couples that had separated and begun seeing each other's spouses, and the fact that no one had ever been prosecuted for the murders in the intervening twenty-year period.[19] The judge

---

[18]The State elicited testimony that Janie was at the police station for about two hours and that the environment was a relaxed one. However, Janie testified that the officers told her that they knew she was lying, they already had the foundation, "and they needed the icing for the cake." She stated that she felt like she was going to be the "icing on the cake" for the police "no matter what."

[19]The judge addressed this point during voir dire when he stated,

As you go home to your homes tonight, just tell your spouse or whomever, well, I have been seated as a juror. And the first thing they're going to ask you, oh, what is it? What is it about, and all of that. You just tell them, "Well, I simply can not discuss it with you."
    Stop and think about it for a minute. Each of us have respect for our spouse. They may have no idea what is being selected up here, you know, for jury today. The moment that they find out, it's amazing, "Oh, I remember what

even suggested that jurors could write a book about the case because "[c]apital offenses that have these long gaps, well, they are known on occasion to end up in book form, so who knows." And as Sheriff Reed testified, many people were interviewed about the murders and gave their opinions about what could have happened. Mitchell testified at trial that "there's probably been a thousand different stories told, a thousand different statements given by everybody involved in [the case]." There appears to be some truth to that statement. Ranger Almond's original investigation, at best, implicated Kenneth and Mitchell—both of whom were identified by the children as at the house the night of the murders. However, Kenneth was killed in an automobile accident, and the State

---

happened twenty-one years ago, and I think it was this, this and this, and you need to do what" -- Well, you know, that isn't going to cut it, and you can understand that.

Later, the trial judge addressed the issue again when he stated,

The Court also would point out that this courtroom has been unusually full of spectators, parties of interest, you know, that are interested in the outcome of the case, as well as just public--the general public who have been attending the course of the trial. You know, and as far as even from the Court perspective as far as specifically being able to identify an individual seated out in the courtroom, it is difficult with the numbers of people that were here.

Finally, before the verdict was read, the trial judge addressed everyone in the courtroom,

All right, now to those in the courtroom, ladies and gentlemen, there has been a great deal of interest following this particular case. I understand that there are family members of each side that are present here in the courtroom. This is a courtroom. We have to have decorum. We simply can not be tolerant of outbursts or inappropriate conduct. I know that this is difficult in this particular case with the lengthy history that we have, a twenty-one year history from the date of the offense. I understand that it impacts a lot of lives, even twenty-one years later.

eventually dismissed the capital-murder indictment against Mitchell due to insufficient evidence and in light of the deal he struck with the State. It appears that it was not until Mitchell, Aaron, and Dalinda changed their stories that it was possible to prosecute Applicant. However, Mitchell testified against Applicant to receive a minimal sentence and to be parole eligible as soon as possible, the State was concerned that Aaron would not testify against Applicant at all, and Dalinda testified in favor of Applicant until she was recalled as a rebuttal witness and completely changed her testimony.[20]

Aside from the voluminous polygraph evidence and the assertion that the witnesses told the truth after "failing" polygraph tests, the only other evidence that the State could rely on to prove Applicant's guilt were the new, changed statements of Aaron and Dalinda.[21] Both of the witnesses' testimony ultimately contradicted their earlier statements given in 1987. Dalinda initially testified in accordance with her 1987 story that she did not see Applicant at the crime scene the night of the murders, but later on rebuttal

---

[20]Dalinda subsequently recanted her rebuttal testimony in a recorded interview for postconviction purposes, but when the convicting court held an evidentiary hearing, she withdrew her recantation, although she continued to vacillate until she was excused as a witness.

[21]During closing arguments, the State made this point when it stated,

> Well, we bring you the testimony of someone who was there. Mitchell Dickey was there that night, and the Judge says that because he's an accomplice, we've got to back up what he says, corroborate it, with things that other people can say. We did that for you.

The State went on to cite Aaron, Dalinda, and Janie's testimony as the corroborating evidence.

she testified that the Tom to whom the children had referred in 1987 was Applicant.[22]

This testimony was also contrary to the evidence that in 1987 Jonathan had identified

Tom as Jim Ed Monkhouse. The State's reliance on Dalinda's change of heart was made

apparent when it urged the jury to conclude that Dalinda did not tell the truth before the

trial in 2008 because she was not strong enough to tell the truth, but by the time she

testified as a rebuttal witness she finally was "brave enough" to remember that Applicant

committed the murders.[23] The State was worried, however, that Aaron would not even

implicate Applicant with his testimony.[24] Despite that concern, Aaron deviated from his

statements given in 1987 and testified that he saw Applicant the night of the murders with

Kenneth, and that he did not know a man named Tom. His explanation for his sudden

reversal and his lie about Tom was that "[w]e was taught not to tell. And my daddy also

told us not to tell on anything, and that was a big part of it." However, Aaron never fully

explained why he waited two decades to tell the truth about who murdered his father; he

said only that he was "tell[ing] on" Applicant because "[h]e killed my daddy, you know."

The State paraphrased Aaron's statement during closing arguments, "He has come here,

and why did he say he was here? He's not here after anything. He says he wants to set

---

[22]Dalinda's change in testimony was so dramatic that it was the subject of a perjury claim, which this Court denied. *See Ex parte Bryant*, 2012 WL 4048839.

[23]It appears that the only difference between Dalinda, Mitchell, and Janie was that Dalinda was not given a polygraph test.

[24]During opening statements, the State told the jury, "You'll hear Aaron say--I'm hoping he still says--it was [Applicant]. It wasn't Tom. He will also say Mitchell Dickey [was] there."

things straight because that guy killed his daddy, and he wants to make things right after twenty-one years." The State, like Aaron, did not have an explanation for why Aaron waited almost twenty-one years "to set things straight."

Unlike Mitchell, Janie took a single polygraph test and was told, but not shown, that she indicated deception. That evidence would have left the jury with the impression that statements given by Janie in 1987 and during the polygraph test were untrue, but anything in the statement (which implicated Applicant) that she initialed after taking the test and being told that she failed must be true, but the defense failed to object. Moreover, the polygraph evidence was crucial because the existence and results of Janie's polygraph test greatly undercut Applicant's rebuttal to the written statement. Instead of the jury fulfilling its role by resolving the factual disputes in the case, the State's introduction of the polygraph evidence encouraged the jury to abdicate its role as factfinder and, instead, to rely on the polygraph machine to ascertain who was telling the truth. *See Nichols*, 378 S.W.2d at 337–38 ("We think it fair to observe that the only reason that anyone would possibly take a lie detector test would be to determine whether or not they were telling the truth."). In addition, aside from that evidence, the State relied almost exclusively on the changed stories of two witnesses to the crime and whose new testimony was contradicted by not only their own prior statements given in the case but also contradicted other statements given in 1987. However, those witnesses were not subjected to polygraph tests, unlike Mitchell and Janie.

We hold that, based on the facts of this case, Applicant's defense counsel was deficient, and that there is a reasonable probability that, but for the testimony adduced at trial regarding Janie's polygraph examination, the results of such testing, and the changed stories of two witnesses, the jury could have reached a different result. Under *Strickland*, that is sufficient to undermine confidence in the outcome of the trial, and Applicant is entitled to a new trial.

## CONCLUSION

Applicant has shown by a preponderance of the evidence that his trial counsel was deficient and that the deficiency prejudiced him. As a result, Applicant is entitled to relief. The judgment in cause number CR01125 in the 102nd District Court of Red River County is set aside, and Applicant is remanded to the custody of the Sheriff of Red River County.

Hervey, J.

Delivered: November 19, 2014

Publish