Opinion filed June 14, 2018



In The

# Eleventh Court of Appeals

_____

## No. 11-16-00186-CR

_____

## ROY MICHAEL GEISENDORFF, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 70th District Court**

**Ector County, Texas**

**Trial Court Cause No. A-45,283**

## M E M O R A N D U M   O P I N I O N

A jury convicted Appellant, Roy Michael Geisendorff, of the third-degree felony offense of assault on a public servant and assessed his punishment at six years' confinement and a $1,500 fine. The trial court sentenced him accordingly. Appellant brings three issues on appeal, contending (1) Appellant was denied effective assistance of counsel when trial counsel failed to strike Juror No. 34; (2) the trial court reversibly erred in denying Appellant's motion for directed verdict;

and (3) the evidence was legally insufficient to support his conviction. Because the evidence was sufficient to support the jury's verdict, because the trial court committed no reversible error, and because failing to strike prospective Juror No. 34 alone did not constitute a denial of effective assistance of counsel on the record before us, we affirm the trial court's judgment.

## Brief Facts

The record before us is, frankly, disturbing. We are provided both witness testimony about the events resulting in Appellant's arrest and dash-camera stills and video records of a portion of those events.

Abner Jonathan Enriquez worked as the manager's right-hand man at the Albertsons Market Street in Odessa.

On July 10, 2015, at a little after 12:00 p.m., he saw a man he identified as Appellant outside the store. He testified Appellant was "hyped up," walking, and shouting at customers. When asked if "people [were] complaining about what he was doing," Enriquez said, "No, they just wanted us to know that there was a little something wrong with him, because, you know, he kept yelling and talking about, you know, Obama needs to come out of the office."

Enriquez testified he was concerned that Appellant was sick or that something was wrong, so he called 9-1-1 and explained the situation and his concerns. Specifically, Enriquez testified:

> I just told them that I needed an officer to go out there, because I had a fellow out there, you know, that was acting kind of strange. I didn't know if he was sick, or what, you know. So that's why I called.
>
> . . . .
>
> Q: You said you thought he might have been sick. Did you ever, did you tell the officers anything else about it?

A: Well, when the first officer arrived, you know, I just told him, you know, he's acting, he's acting strange, you know. . . .

Q: Do you remember ever saying anything about him being intoxicated or anything like that?

A: No, sir.

Officer Sammy Eason was the first police officer to arrive. Enriquez met Officer Eason outside the store. He testified that he told the officer what was going on and that the officer waited for Appellant to walk up to the officer. The officer asked Appellant for identification, and Appellant argued with him, saying that he had done nothing wrong and that he knew his rights. Enriquez testified the first officer tried to put his hand in Appellant's pocket and asked Appellant if he had anything in his pockets. But the video shows no movement toward Appellant by Officer Eason—only conversation.

Enriquez said that, when the second officer arrived, Appellant continued to deny that he had anything in his pockets. Enriquez testified that both officers continued to try to check Appellant's pockets.

Officer Eason testified that Officer Chris Aguilar arrived and saw a bulge in Appellant's front pocket so the officers escalated their efforts to search Appellant for weapons. Appellant had a 32- or 44-oz drink in one hand and a cigar in the other hand. Appellant continued to yell and began kicking at the officers. Enriquez testified the officers were "trying to calm him down and get him to, to handcuff him so they could subdue him."

Officer Eason testified he had been the first officer to arrive on the scene. He described his experience as including two and one-half years with the Odessa Police Department, preceded by eleven and one-half years in the military in both the United States Army and the United States Navy. When Officer Eason arrived, Appellant

3

turned and started walking away, so he called Appellant back. Appellant complied. Officer Eason testified that, as far as he knew, Appellant was committing no crimes and doing nothing wrong.

Officer Eason said Appellant was pacing back and forth. He contended that the pacing and Appellant's nervousness were an indication of "fight or flight." The video does not reveal pacing by Appellant. Officer Eason testified that he asked Appellant for identification and that Appellant responded by asking why Officer Eason needed to see his ID. He described Appellant's response as passive resistance and contended that Appellant was challenging him and trying to goad him to see what he would do. Officer Eason waited until his backup, Officer Aguilar, arrived before trying to pat Appellant down. They decided to pat Appellant down because Officer Aguilar saw a bulge in one of Appellant's front pockets.

Officer Eason also explained, in response to questioning, that the reason for patting down a person was to check for weapons for safety reasons. In making the decision whether to perform a pat-down, Officer Eason's practice was to pat people down based on "[t]heir demeanor, how they're reacting, how they're behaving." When they pat someone down, their practice is to get the person under physical control by "mobiliz[ing]" [sic] their hands as though they were going to put cuffs on the person.

The video reflects that, when Officer Aguilar arrived on the scene, he came forward quickly and grabbed Appellant. He knocked the cigar out of Appellant's hand to prevent his being burned and began to try to twist Appellant's hands behind his back. He and Officer Eason began to attempt to search Appellant. Although Appellant had agreed to a pat-down, when the officers began to immobilize his hands and to knock the cigar out of his hand, he began to resist and shouted at them to take their hands off him. There is testimony that Officer Eason thought Appellant was throwing his drink at him, but Appellant was actually hitting Officer Eason in the

4

left cheek with his drink in his hand. Officer Aguilar admitted that he did not ask Appellant to put the drink or the cigar down before he grabbed Appellant's arm. Appellant never made any threats to the officers, and the officers found no weapons on him.

Officer Aguilar testified he had been a police officer for twenty-seven years and had attained the rank of corporal. He was a task force officer on loan to the DEA from the Odessa Police Department. His training as a police officer and a DEA task force officer was extensive. He testified that, when dealing with people suspected of being under the influence of narcotics or controlled substances, he was trained to take extra precautions to make sure the suspect had no weapon or object that could be used as a weapon. Officer Aguilar described Appellant as acting as though he were intoxicated and as having a bulge in his right front pocket that could be a weapon.

Officer Aguilar testified that, when Appellant agreed to the pat-down, he started to grab Appellant's hands to twist them behind him and told him to drop his cigar and that Appellant then started to pull away and to tell Officer Aguilar to get off him. At that point, the encounter essentially escalated to a brawl that continued until the officers threatened Appellant with pepper spray.

Officer Aguilar testified that, after Appellant was threatened with pepper spray, cuffed, arrested, and secured in the back seat of Officer Aguilar's police unit, the in-car video system recorded Appellant mumbling and rambling and making "involuntary movements with his mouth." He testified Appellant leaned forward, then leaned back, and talked to himself. Officer Aguilar testified that his twenty-seven years as a police officer and his DEA training and experience qualified him as an expert to testify that involuntary clenching of the jaw was usually a sign of somebody being on a controlled substance or needing the controlled substance. These activities, except for talking, are not reflected on the video that was admitted

into evidence. Officer Aguilar admitted he never found any drugs on Appellant. He also admitted that, although Appellant appeared to him to be intoxicated at the scene of the encounter, he did not appear to be intoxicated during booking.

Nowhere in the record does either officer suggest he had been trained in dealing with mentally ill persons. Yet, the record reflects several suggestions that Appellant might have mental health issues. Appellant's mother, Tiffany Geisendorff, sent a letter dated October 18, 2015, to the trial judge, explaining that Appellant had exhibited signs of mental illness for many years. Her mother's sister had been diagnosed with manic depressive schizophrenia and had spent most of her life in and out of care facilities. Appellant's mother had tried to get mental health treatment for Appellant but had been told she should call the police. The Pearland police helped, and later the Brazoria County Sheriff's Office helped. But the resulting in-patient treatment lasted less than seventy-two hours. She said Appellant had shot himself as a teenager; was paranoid; talked to himself; used drugs; referred "to his sister as Jessica Christ, sister to Jesus (himself)"; referred to his uncle as the archangel Gabriel; and was, generally, disconnected from reality.

It is unclear whether this information reached the trial judge. Ms. Geisendorff was sent a letter from the court coordinator instructing her that her letter was an attempt at an improper ex parte communication with the judge and that the court would not act on her letter because the trial judge could act only on matters properly before the court. The offense date alleged in the indictment was July 10, 2015. We have repeatedly recognized both the interrelation of and the legal distinction between mental illness and insanity at the time of the offense.[1]

On February 16, 2016, Appellant's trial counsel filed a Motion Suggesting Incompetency and Request for Examination. On March 10, 2016, the trial court

---

[1] *Routh v. State*, 516 S.W.3d 677 (Tex. App.—Eastland 2017, no pet.).

entered an agreed order for psychiatric examination providing for Dr. Roddy Strobel to examine Appellant for the purpose of determining whether Appellant was insane at the time of the offense. A copy of Dr. Strobel's report has been forwarded to this court in a sealed record. This court's review of Dr. Strobel's report does not indicate that she was aware of the letter Ms. Geisendorff sent to the court or of Appellant's history of mental health issues, including his having shot himself as a teenager. The record is silent as to whether Appellant's trial counsel was aware of the letter.

The record is disturbing because Enriquez's testimony suggests he believed he was calling 9-1-1 to request a welfare check on Appellant. Ms. Geissendorff's letter suggests she believed the police were called to perform a welfare check on Appellant. The police officers appear not to have been told they were called for a welfare check on a suspected mentally ill person but to believe they had been called to investigate criminal activity by Appellant. As a result, both the officers and Appellant were put at risk of an unexpectedly volatile confrontation. We take notice[2] of the fact that an increasing number of counties are recognizing the need to provide dispatchers with the tools necessary for determining whether mental illness may be a factor in determining who to dispatch to a call and what information must be provided to the team responding to the call.[3]

## *Ineffective Assistance of Counsel*

In his first issue, Appellant argues that trial counsel rendered ineffective assistance in failing to exercise a peremptory strike on Veniremember No. 34, Jesse Ray Duarte, a captain with the police department that arrested and jailed Appellant. He knew the two arresting officers, Eason and Aguilar, through his employment. Although Captain Duarte said he could be a fair and impartial juror who would make

---

[2]TEX. R. EVID. 201.

[3]*See, e.g.*, BLUEPRINT FOR SUCCESS: THE BEXAR COUNTY MODEL, http://www.naco.org/sites/default/files/documents/Bexar-County-Model-report.pdf.

a decision based on the evidence alone, he also stated he believed police officers generally tried to help people. He disagreed with the suggestion that police officers, by the nature of their job, assume the risk of being assaulted. He stated he believed the primary purpose of punishment was punishment alone, but he could consider the entire range of punishment. His opinions did not differ markedly from those of the other members of the venire.

The prosecutor mentioned Captain Duarte when the trial judge raised the question of challenges for cause. Defense counsel stated he had no objection to Captain Duarte's not serving as a juror. The trial court moved on to the discussion of another veniremember, and no one lodged a specific challenge for cause. There was an indication defense counsel believed Captain Duarte had been struck, but he did not pursue the issue. Both sides exercised all their peremptory challenges. Appellant did not request an additional strike.

The panel included a nurse who referred patients to Dr. Strobel, a man who worked with Post Sentence Monitoring and was a former employee of the sheriff's department, a jailer, an IT specialist who worked on police cruisers and knew the arresting officers, a former law enforcement officer, and the booking clerk who actually booked Appellant into jail.

To establish ineffective assistance of counsel, an appellant must show that his counsel's representation was deficient and that the deficiency prejudiced the defense.[4] An ineffective-assistance claim must be "firmly founded in the record," and "the record must affirmatively demonstrate" the meritorious nature of the claim.[5] Direct appeal is usually an inadequate vehicle for raising an ineffective-assistance-

---

[4]*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013); *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999).

[5]*Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

of-counsel claim because the record is generally undeveloped.[6] In evaluating the effectiveness of counsel under the deficient-performance prong, we look to the totality of the representation and the particular circumstances of each case.[7] The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error.[8] Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct was not deficient.[9]

It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record or when counsel's reasons for failing to do something do not appear in the record.[10] "Trial counsel 'should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective.'"[11] If trial counsel is not given that opportunity, we should not conclude that counsel's performance was deficient unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it."[12] As the Texas Court of Criminal Appeals has explained:

> A claimant must generally prove deficiency using affirmative evidence in the trial record sufficient to overcome the presumption that the challenged action was sound trial strategy. However, when no

---

[6]*Menefield v. State*, 363 S.W.3d 591, 592–93 (Tex. Crim. App. 2012); *Thompson*, 9 S.W.3d at 813–14.

[7]*Thompson*, 9 S.W.3d at 813.

[8]*See Strickland*, 466 U.S. at 688–89; *Nava*, 415 S.W.3d at 307.

[9]*Nava*, 415 S.W.3d at 307–08.

[10]*Menefield*, 363 S.W.3d at 593; *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007).

[11]*Menefield*, 363 S.W.3d at 593 (quoting *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003)).

[12]*Nava*, 415 S.W.3d at 308 (quoting *Menefield*, 363 S.W.3d at 593).

reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for acting as he did.[13]

No motion for new trial was filed. Nothing in the record explains why trial counsel did not strike Captain Duarte. We have no way of knowing, beyond mere speculation, counsel's reasoning or trial strategy. The evidence that Appellant struck Officer Eason was uncontested. The issue was whether the officer felt pain. He testified that he did. The other contested issue was Appellant's state of mind. Based on the record before us, the jury's determination was well-founded in the record. The jury convicted Appellant of a third-degree felony, and, despite evidence of Appellant's having committed prior criminal offenses, the jury assessed mid-range punishment of six years' confinement.

Because counsel's reasons for his conduct do not appear in the record and because there is at least the possibility that the conduct could have been grounded in legitimate trial strategy, we defer to counsel's decisions and overrule Appellant's first issue.[14]

### *Sufficiency of the Evidence Standard of Review*

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[15] This standard gives full play to the

---

[13]*Ex parte Bryant*, 448 S.W.3d 29, 39–40 (Tex. Crim. App. 2014) (citations, internal quotation marks, and alterations omitted).

[14]*See Garza v. State*, 213 S.W.3d 338, 348 (Tex. Crim. App. 2007).

[15]*Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.[16]

The trier of fact is the sole judge of the weight and credibility of the evidence.[17] Thus, when performing an evidentiary sufficiency review, we may not reevaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder.[18] Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict.[19] We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution.[20]

To determine whether the State has met its burden under *Jackson* to prove a defendant's guilt beyond a reasonable doubt, we compare the elements of the crime as defined by the hypothetically correct jury charge to the evidence adduced at trial.[21] Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.[22] The law as authorized by the indictment means the

---

[16]*Id.* at 319; *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. (2015).

[17]*See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014).

[18]*See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012).

[19]*Murray*, 457 S.W.3d at 448.

[20]*Id.* at 448–49.

[21]*Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014); *see Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law.").

[22]*Thomas*, 444 S.W.3d at 8.

statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument.[23]

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt.[24]

*Sufficiency of the Evidence and Denial of Motion for Directed Verdict*

In his second and third issues on appeal, Appellant challenges the sufficiency of the evidence of *mens rea* and of bodily injury and the propriety of the trial court's denial of his motion for directed verdict.

The Texas Penal Code provides:

(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

(c) A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary

---

[23]*See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

[24]*Dobbs*, 434 S.W.3d at 170; *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).

person would exercise under all the circumstances as viewed from the actor's standpoint.[25]

Appellant points out that, when the officers arrived, they misread the situation and interpreted Appellant's walking back and forth as "fight or flight" mode. They were unaware that Appellant was continuing the conduct that grocery store employees and customers had observed and had caused Enriquez to call the police. As a result, he argues, they responded aggressively to the situation they had misread.

Appellant, on the other hand, was cooperative when the officers first asked to pat him down. But, instead of continuing the investigation in the "calm and professional manner" Officer Eason had adopted, "Officer Aguilar made a knee jerk [sic] decision before he ever spoke to [Appellant] or Officer Eason." In response, Appellant argues, he instinctively reacted and "struck out randomly in his attempts to free himself from a possible confinement that was unexpected, unjustified, and undeserved."

He argues that he acted spontaneously in his confusion and surprise. Consequently, he contends, he did not act intentionally, knowingly, or recklessly, as those mental states are defined by statute. Appellant argues that his spontaneous response does not satisfy the *mens rea* requirements to show he acted either intentionally or knowingly or recklessly.

To the extent Appellant argues his response to the officers was spontaneous and without opportunity to form intent, the portion of the struggle visible on the dash-camera video shows the contrary. To the extent Appellant argues he was justified in resisting an unlawful arrest, he is in error. The use of force is not justified to resist even an unlawful arrest or search the actor knows is being made by a peace officer.[26] Appellant does not suggests that he was defending himself against

---

[25]TEX. PENAL CODE ANN. § 6.03(a), (b), (c) (West 2011).

[26]*Id.* § 9.31(b)(2).

excessive force or that he did not recognize as police officers the uniformed men driving marked police units.

He also argues that the State failed to prove he caused bodily injury to Officer Eason. "'Bodily injury' means physical pain, illness, or any impairment of physical condition."[27] Officer Eason testified that, when Appellant punched him in the face, it hurt. The record shows a melee ensued after Officer Aguilar arrived and grabbed Appellant. Appellant began kicking and swinging his arm, and the cup in his hand connected with Officer Eason's face. The activity moved out of camera view unabated.

Applying the appropriate standard of review, we hold the evidence is sufficient to support the trial court's judgment.

An appellate court treats a complaint that a trial court improperly denied a motion for directed verdict as a challenge to the sufficiency of the evidence.[28] The standard of review for a directed verdict claim is the same standard applied in a sufficiency-of-the-evidence challenge.[29] Having determined that the evidence is sufficient to support the trial court's judgment, we hold the trial court committed no error in denying Appellant's motion for directed verdict. We overrule Appellant's second and third issues on appeal.

---

[27]*Id.* § 1.07(a)(8) (West Supp. 2017).

[28]*Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996) (stating that an appellate court treats a point of error complaining about a trial court's failure to grant a motion for directed verdict as a challenge to the legal sufficiency of the evidence).

[29]*Pollock v. State*, 405 S.W.3d 396, 401 (Tex. App.—Fort Worth 2013, no pet.).

We affirm the judgment of the trial court.

LEE ANN DAUPHINOT

SENIOR JUSTICE

June 14, 2018

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Willson, J.,
Bailey, J., and Dauphinot, S.J.[30]

---

[30]Lee Ann Dauphinot, Senior Justice (Retired), Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.